**United States District Court**
**District of Massachusetts**

_____
                                          )
JEFFREY SANTOS and                        )
KATHLEEN EDWARDS,                         )
     Plaintiffs,                         )
                                          )      Civil Action No.
     v.                                  )      10-11894-NMG
                                          )
CITY OF FALL RIVER and                    )
WILLIAM FLANAGAN, in his                  )
capacity as Mayor of Fall River, )
     Defendants.                         )
_____ )

**MEMORANDUM & ORDER**

GORTON, J.

This dispute concerns contracts entered into between plaintiffs Jeffrey Santos ("Santos") and Kathleen Edwards ("Edwards") (collectively "plaintiffs") and the City of Fall River in the waning days of the administration of Mayor Robert Correia ("Correia" or "the outgoing Mayor"). Mayor Correia appointed plaintiffs to positions within a municipal agency and agreed, on behalf of the City, to three-year employment contracts with plaintiffs in December, 2009. Plaintiffs were terminated in January 2010 by the new mayor, Edward Flanagan ("Flanagan" or "the incoming Mayor").

Plaintiffs claim that the subject terminations violated their First Amendment and Due Process rights and breached their respective employment agreements. Now pending before the Court are the parties' cross-motions for summary judgment.

-1-

I.   **Facts**

Plaintiffs Santos and Edwards are close associates and
long-time political supporters of Robert Correia.  Prior to his
election as mayor in 2008, Mr. Correia served as the State
Representative for the Seventh Bristol District, which includes
Fall River, for over 30 years.  Both plaintiffs volunteered in
all of Mr. Correia's political campaigns, beginning with his
first campaign for state representative in the early 1970s.  On
February 1, 2008, then Mayor Correia appointed both plaintiffs to
positions in the Office of the Mayor: Mr. Santos served as an
Administrative Assistant and Ms. Edwards became Mayor Correia's
Chief of Staff.  Each served under renewable, one-year employment
agreements which permitted the employer and the employee to
terminate the agreement for any reason on 30 days written notice.

Shortly after assuming the mayoralty, in January, 2008,
Mayor Correia fired the Executive Director of the Community
Development Agency ("the CDA"), an individual named Steven Long.
The CDA applies for and administers certain federal grants
through programs under the umbrella of the Department of Housing
and Urban Development ("HUD"), which are, in turn, distributed to
City departments and nonprofits that benefit low- and
moderate-income individuals.  After firing Mr. Long, Correia
appointed Robert Laughlin as Executive Director, and he served in
that capacity until his resignation in July, 2008.  When Laughlin

resigned, Correia first asked the second-in-command of the CDA, Michael Dion, if he was interested in assuming the role of Executive Director but Dion declined. As a result, the Executive Director position remained vacant but plaintiff Santos shared some of the Executive Director's responsibilities with Dion in order to facilitate the CDA's continued operation.

The mayoralty term in Fall River is two years, and in September, 2009, Correia lost a primary election that meant that his term was to expire in early 2010. At some point before his primary defeat, Correia discussed the possibility of appointing Santos as Executive Director of the CDA with both Santos and the City Administrator, Adam Chapdelaine. Correia appointed Santos to the subject position in November, 2009, without conducting an applicant search, although Santos continued to work in the Mayor's office for some time after his appointment. At the time of his appointment, the Executive Director's post had been vacant for 16 months.

Although the exact timing is disputed, at about the time of the September, 2009 primary, Correia and Edwards discussed her appointment to the CDA as Contracts Compliance Officer and Executive Secretary, a position scheduled to become vacant due to the retirement of a CDA employee. Plaintiffs recall discussing the position prior to the mayoral primary while defendant Flanagan contends that the decision was made after Correia lost

-3-

the primary.  Correia appointed Edwards as Contracts Compliance
Officer/Executive Secretary on December 1, 2009.

In November, 2009, Correia directed the City law department
to draft employment agreements for both Santos and Edwards.  On
December 21, 2009, both Santos and Edwards entered into
three-year employment agreements with the City.  Both agreements
contained termination clauses that significantly restricted the
City's ability to terminate plaintiffs, i.e. the City's right to
terminate both agreements was limited to the death, resignation
or retirement of plaintiffs or "just cause," defined as the
"wanton or willful dissipation" of the employee's duties or a
"serious violation" of the agreement's other provisions.  Most
significantly, both agreements provided that if the City
terminated either employee "for convenience," it was obligated to
pay the remainder of the salary due during the unexpired term,
plus any accrued vacation or sick time.

William Flanagan was inaugurated as Mayor of Fall River on
January 4, 2010.  The following day, he met with Santos and
Edwards and told them that their employment was terminated.  He
provided each plaintiff with a signed letter explaining that they
were being fired because their positions were "not properly
filled" and that their written contracts were "void and against
Public Policy."  Plaintiffs were not afforded an opportunity to
contest the basis of their terminations at any time.

-4-

After plaintiffs were terminated, Mr. Dion assumed the role of Executive Director.  The CDA interviewed several candidates to fill the resulting two vacancies and ultimately hired two individuals for the positions of Contract Compliance Officer and the newly created position of Neighborhood Outreach Coordinator. Both appointees had supported Mayor Flanagan during the preceding election and had donated money to his campaign.

II.  **Procedural History**

On September 14, 2010, plaintiffs filed a complaint against the City of Fall River and William Flanagan, in his official capacity as Mayor.  Defendants duly removed the case to this Court in November, 2010 on federal question grounds.

The Complaint includes four counts based upon plaintiffs' allegedly unlawful termination by defendants.  Count I alleges that Santos and Edwards were terminated on the basis of their political affiliation with the outgoing Mayor, in violation of their First Amendment rights.  Count II alleges that Santos and Edwards held property interests in their continued employment, of which defendants deprived them without due process in violation of their rights under the Fifth and Fourteenth Amendments.[1] Count III alleges that defendants breached plaintiffs' employment contracts when they fired them and therefore owe them contract

---

[1] Both constitutional claims are guaranteed to plaintiffs under 42 U.S.C. § 1983 and are brought pursuant to that statute.

damages.   In the alternative, in Count IV, plaintiffs seek a declaration that their employment contracts are enforceable.

Pending before the Court are the parties' cross-motions for summary judgment, filed in June, 2012.  Defendants claim entitlement to summary judgment on all four counts while plaintiffs move for summary judgment on Counts II, III and IV.

## III. **Analysis**

### A.    **Standard of Review**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Johnson v. Gordon, 409 F.3d 12, 16-17 (1st Cir. 2005)(quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." Id.  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. <u>Johnson</u>, 409 F.3d at 17.  Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. <u>Id.</u>

**B.   Political Affiliation Discrimination (Count I)**

Defendants argue that there is insufficient evidence to support plaintiffs' claim of political affiliation discrimination and, alternatively, that the Executive Director position is a policymaking position for which political affiliation is an appropriate requirement.

**1.   Political Affiliation Discrimination**

The First Amendment protects non-policymaking public employees from adverse employment decisions that are based upon their political affiliation. <u>Barry</u> v. <u>Moran</u>, 661 F.3d 696, 703 (1st Cir. 2011).  Analysis of such claims proceeds in two parts. First, a plaintiff must make out a prima facie claim of political discrimination by showing that 1) the plaintiff and defendant

have opposing political affiliations, 2) the defendant is aware
of the plaintiff's affiliation, 3) an adverse employment action
occurred, and 4) political affiliation was a substantial or
motivating factor for the adverse employment action. <u>Welch</u> v.
<u>Ciampa</u>, 542 F.3d 927, 938-39 (1st Cir. 2008).  Plaintiffs
alleging political discrimination need not rely upon a "smoking
gun" but may prove their case on the basis of circumstantial
evidence alone. <u>Anthony</u> v. <u>Sundlun</u>, 952 F.2d 603, 605 (1st Cir.
1991).

Unlike the standard of proof in a Title VII case, in a claim
for political discrimination, if a plaintiff states a prima facie
case, the defendant then has the burden of persuasion and must
prove that its reason for the discharge is credible and that it
would have taken the adverse action without regard to the
employee's political affiliation. <u>Padilla-Garcia</u> v. <u>Guillermo
Rodriguez</u>, 212 F.3d 69, 77 (1st Cir. 2000).  Accordingly, summary
judgment is warranted in political discrimination cases only when
the

> defendants' evidentiary proffer compel[s] the finding
> that political discrimination did not constitute a but
> for cause of the [adverse action].

<u>See</u> <u>Welch</u>, 542 F.3d at 941 (internal quotation omitted).

Here, plaintiffs have presented sufficient evidence to state
a prima facie case of political discrimination.  Correia and
Flanagan ran against one another in the mayoral primary that

Correia lost in September, 2009, rendering them "opposing factions" for present purposes. See id. at 939 (noting factions within same party that oppose one another in primary elections satisfy the opposing factions element).  It is undisputed that Santos and Edwards were among Correia's childhood friends and closest supporters, having volunteered in all of his political campaigns for over 30 years and having been employed by Correia both while he was a state representative and while he was Mayor. Both Santos and Edwards interfaced with constituents on behalf of Correia, including during the 2008 primary involving Correia and Flanagan.  Those facts, together with the summary termination of both plaintiffs and their subsequent replacement by the only two applicants to the CDA who had supported Flanagan and made donations to his campaign, create a genuine issue of material fact as to whether plaintiffs were terminated on the basis of their political affiliation.

### 2.    Policymaking Position

Notwithstanding the preceding analysis, certain positions may be subject to discharge for political reasons: the First Amendment does not bar public employers from considering political affiliation for positions for which political affiliation is an appropriate requirement for effective performance. Uphoff Figueroa v. Alejandro, 597 F.3d 423, 429 (1st Cir. 2010) (internal citations and quotations omitted).  This

exception for "policymaking" officials or those in a "position-of-trust" exists in order to permit political officials to hire staff who will help them execute their policy goals and, in so doing, effectuate the expressed desire of the voters. Id.

Whether a position is one of policymaking or a position-of-trust is a question of law for the court. Id. (citing Flynn v. City of Boston, 140 F.3d 42, 44 (1st Cir. 1998)). The First Circuit frequently (but not always) employs a two-step inquiry to assist in this analysis: first, by deciding whether the functions of the plaintiff's agency involve issues in which there is "room for political disagreement" on goals; and second, by deciding whether the plaintiff's responsibilities within that agency resemble those of a policymaker or "other office holder whose function is such that party affiliation" is an appropriate criteria for tenure. Ortiz-Pinero v. Rivera-Arroyo, 84 F.3d 7, 12 (1st Cir. 1996).

Subsequent decisions have clarified that the official may be a subordinate and need not be the ultimate decisionmaker in the agency; it is enough that the official is involved in policy, even if only as an adviser, implementer, or spokesperson. Uphoff Figureoa, 597 F.3d at 429 (internal citations and quotations omitted). Actual functions of the job, not titles, control, and an official description of job functions is a presumptively reliable basis for determining those functions. Id. at 430

-10-

(internal citation omitted).  When assessing job functions, relevant indicia of a policymaking position include technical competence, power to control others, influence on programs, authority to speak in name of policymakers and contact with elected officials. See, e.g. Ortiz-Pinero, 84 F.3d at 12 (listing factors).

Both prongs of the two-part inquiry are satisfied here.  The CDA is a city agency the main function of which is to apply for federal grants, primarily Community Development Block Grants that are disbursed through HUD, and to distribute those funds to City entities for the benefit of low- and moderate-income individuals. The CDA thus determines, if only indirectly, what entities and what constituents receive local services, a "primary function of any local government entity" upon which turns "the success or failure" of many local government elections. See Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 243 (1st Cir. 1986) (finding agency charged with provision of low-income housing met first prong).  Accordingly, where the funds are finite, there is sufficient room for disagreement on the CDA's priorities so as to satisfy the first prong.

The Executive Director's main function, as described in a job posting by the City of Fall River, is to oversee grant applications and ensure that distribution of the funds accords with the purposes delineated by HUD regulations.  One major step

in that process involves the submission of a Five-Year Consolidated Plan to HUD, which describes how the CDA will use the HUD grants to achieve HUD's goals.  The Executive Director solicits citizen input regarding projects that will achieve HUD's priorities through public hearings and discusses his findings with the Mayor.  The Mayor ultimately determines which projects to fund in pursuit of the goals established by HUD but he depends upon the Executive Director's advice regarding HUD guidelines when setting the Plan's priorities.  The Mayor also depends upon the Executive Director to implement his chosen priorities and to represent his positions on community development issues before the City Council.  Finally, as head of the CDA, the Executive Director supervises its staff.

Those duties demonstrate that the Executive Director is a policymaker subject to political discharge: the Director must be technically competent with respect to HUD guidelines, has supervisory authority over CDA staff, speaks on behalf of the Mayor regarding community development issues and interfaces with elected officials.  Although plaintiffs argue that federal restrictions on how the funds are spent leaves little "wiggle room" for the Director, as long as the funds authorized are not unlimited, the Mayor and the Director must still choose among agencies and constituents and determine how best to further the mission of the CDA.  Finally, this result accords with the weight

-12-

of authority that finds directors with similar responsibilities and supervisory authority to be subject to political dismissal. See Ortiz-Pinero, 84 F.3d at 17 (directorship of housing agency funded by federal grants a political position); see also Flynn, 140 F.3d at 45 (noting political discharge of mid- or upper-level officials with significant connection to policymaking has been upheld and collecting cases).

In sum, the Executive Director of the CDA is a position sufficiently involved in policymaking to render its incumbent subject to political discharge.  Defendants' motion for summary judgment with respect to the claim of political affiliation of plaintiff Santos will be allowed.

### C. Breach of Contract (Counts III and IV)

The parties cross-move for summary judgment on plaintiff's claim for breach of contract and declaratory judgment. Plaintiffs argue that defendant breached their employment contracts because it did not fire them for cause, and, therefore, plaintiffs are entitled to either severance payments or the benefit of their bargain.  Defendant counters that the contracts are void in their entirety because they violate public policy.

Massachusetts courts will decline to enforce contracts on the ground that they are void as against public policy in the unusual circumstance where the "public interest in freedom of contract is … outweighed by public policy." Beacon Hill Civic

Ass'n v. Ristorante Toscano, Inc., 662 N.E.2d 1015, 1017 (Mass. 1996).  The public policy affronted must be derived from legislation or legal precedent rather than from general considerations of supposed public interests. Genzyme Corp. v. Fed. Ins. Co., 622 F.3d 62, 69 (1st Cir. 2010) (citing Beacon Hill Civic Ass'n, 662 N.E.2d at 1017).  If, however, a court finds that public interest in freedom of contract is outweighed by public policy, the contract will not be enforced. Beacon Hill Civic Ass'n, 662 N.E.2d at 1017.

Here, defendant identifies a public policy interest in preventing lame-duck municipal entities from binding their successors through term contracts with onerous termination provisions and points to two Massachusetts precedents as its source.  In Duggan v. City of Taunton, the Supreme Judicial Court invalidated two one-year contracts awarded to two attorneys by a city commission for "all legal advice" just before the three-person governing structure was to be replaced by a five-person board. 277 N.E.2d 268 (Mass. 1971).  The SJC premised its decision upon the common law principle that a "public officer cannot give an appointee a tenure of office beyond [his] own," although the opinion focuses on the "special application [of that principle] to the employment of attorneys." Id. at 271-272 (internal citations omitted).

In White v. Town of Holbrook, the Massachusetts Appeals

-14-

Court relied upon <u>Duggan</u> to invalidate a three-year contract
awarded to the town police chief by its Board of Selectmen, a
mere four days before an election affecting two seats on the
Board and where voters were to consider extending civil service
rules to the police chief position. 537 N.E.2d 173 (Mass. App.
Ct. 1989).  The <u>White</u> court construed <u>Duggan</u> to extend beyond
agreements for legal services such that

> public policy could require invalidation of municipal
> contracts made for an unduly long period, or to commence
> or to be in effect at a date unreasonably after the
> contracting body will cease [to exist] ... or in
> circumstances which indicate either an unconscionable
> effort to bind a successor board or officer or lack of
> good faith.  Much will depend upon the particular facts
> and circumstances.

<u>Id.</u> at 1118 (quoting <u>Duggan</u>, 277 N.E.2d at 273).  Notably,
the <u>White</u> court expressly confined its decision to the
circumstances before it and expressed no view regarding
appointments by "lame-duck" entities "because of a
legitimate vacancy in an office." <u>Id.</u>

     Neither case controls here because plaintiffs are not
attorneys and both were appointed to fill existing
vacancies.  In both <u>Duggan</u> and <u>White</u>, however, the courts
took exception to lame-duck appointments designed to bind
successors and the instant case falls within that category.
Courts in other jurisdictions have also applied the same
principle while declining to enforce employment contracts
with municipal entities on public policy grounds. <u>See Figuly</u>

v. <u>City of Douglas</u>, 853 F. Supp. 381, 384 (D. Wyo. 1994),
<u>aff'd</u>, 76 F.3d 1137 (10th Cir. 1996); <u>City of Hazel Park</u> v.
<u>Potter</u>, 169 Mich. App. 714, 723, 426 N.W.2d 789, 793 (1988);
<u>Falls Twp.</u> v. <u>McManamon</u>, 537 A.2d 946, 947 (Pa.Cmwlth.
1988).

   The Court is satisfied that the undisputed
circumstances surrounding the instant employment contracts
demonstrate an unconscionable effort to bind a successor and
connote a lack of good faith such that the contracts can not
be enforced.  Plaintiffs were visible, long-time political
supporters of Mayor Correia who, at the time of their
appointments, served in the office of the outgoing Mayor.
They were appointed to their positions at the CDA after
Mayor Correia lost the primary election and signed their
three-year employment agreements a few weeks prior to Mayor
Flanagan's taking office.

   Most important, the employment agreements extended
beyond the tenure of Mayor Correia and contained provisions
likely to frustrate any attempt by the incoming Mayor to
remove them.  The combination of a just cause provision
prohibiting termination except in cases of "wanton or
willful dissipation of duties or serious violation" of the
Employment Agreement and the severance provision made it
difficult to terminate plaintiffs even for poor performance.

Those provisions are in stark contrast to the at-will status of other CDA employees and the employment agreements under which plaintiffs previously served, i.e. one-year contracts terminable by either party on 30 days written notice "for any reason."

While there may sometimes be a basis for including severance and just cause protections in municipal employment contracts, the undisputed facts lead this Court to conclude that those justifications are lacking here.  No evidence suggests that either Santos or Edwards even requested the severance or good-cause provisions, and absent the need to include them, their inclusion is suspect, especially because the terms depart so dramatically from both plaintiffs' prior agreements.  That departure also discredits plaintiffs' claim, based upon the deposition of the drafting attorney, that both the just cause and severance provisions were standard terms in city employment agreements.

The only reasonable inference the Court can draw is that Mayor Correia signed the agreements intending to prevent the next administration from terminating either Santos or Edwards without paying an exorbitant termination fee.  While such circumstances did not compel plaintiffs' termination, they render their employment agreements

contrary to public policy and therefore void.[2]

In the alternative, plaintiffs urge the Court to strike the clause affording severance and to enforce the contract in its absence because both employment agreements contain severability clauses.  Because the Court finds the contract to be void as against public policy, it is void <u>ab</u> <u>initio</u> and "no breach of contract is possible, and no judgment for money damages can be obtained under the contract." <u>Massachusetts Mun. Wholesale Elec. Co.</u> v. <u>Town of Danvers</u>, 577 N.E.2d 283, 292-93 (Mass. 1991).

Because the Court finds that plaintiffs' employment agreements are void against public policy, defendant's motion for summary judgment on Counts III and IV will be allowed and plaintiff's motion for summary judgment on those counts will be denied.

**D.   Due Process Violation (Count II)**

The parties cross move for summary judgment on plaintiffs' allegation that their termination deprived them of a property interest in their job without due process of law.  The parties agree that the plaintiffs were not afforded due process prior to, or after, their discharge.  The dispute centers on whether either

---

[2] Plaintiff notes that the incoming Mayor awarded three-year contracts to his corporate counsel, which impliedly would bind his successor.  Casting doubt upon those contracts, however, does not alter the circumstances surrounding the formation of plaintiffs' employment agreements.

Santos or Edwards held a property interest in their positions.

In order to hold a protected property interest for the purposes of a due process claim, a plaintiff must have a "legitimate claim of entitlement to [the interest]" rather than an "abstract need or desire" for it or a "unilateral expectation" of obtaining it. Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). The contours of what constitutes a protected property interest are not contained within the Constitution but are instead defined by "existing rules or understandings" stemming from an independent source, such as state law, that secure a benefit or support a claim of entitlement to one. Id.

Plaintiffs claim the property interest derives from the "just cause" provision contained within plaintiffs' employment agreements and within a federal hiring guideline applicable to the CDA (called the "Affirmative Action Plan" or "the Plan").

Their first alleged property right is readily dismissed. Because the Court finds that their contracts were void against public policy, plaintiffs were at-will employees. See Derrig v. Wal-Mart Stores, Inc., 942 F. Supp. 49, 54 (D. Mass. 1996) (citation omitted) (noting Massachusetts law assumes employment at-will where there is no contract). An at-will employment contract, without more, does not create a reasonable expectation of continued employment. Cummings v. S. Portland Hous. Auth., 985 F.2d 1, 2 (1st Cir. 1993).

In order to sustain their due process claim on the basis of the "just cause" provision contained with the Plan, plaintiffs must establish that the Plan formed the basis of an express contract, that the parties agreed the Plan would govern the terms of their employment, or that an implied contract arose that included the terms of the Plan. See O'Brien v. New England Tel. & Tel. Co., 664 N.E.2d 843, 847 (Mass. 1996) (explaining ways that terms of personnel manual may form contract between employer and employee). The Court discerns no such evidence, but even if there were, the "just cause" provision contained in the Plan does not apply to plaintiffs. The "Dismissals" section of the Plan states that employees who are dismissed during the "probationary period … shall not be granted the privileges" set forth in the immediately preceding paragraphs, which include the "just cause" provision. The only other mention of the "probationary period" within the Plan refers to it as a period of three months.

The undisputed facts demonstrate that neither plaintiff completed three months of employment prior to his or her termination. Plaintiffs were both terminated on January 5, 2010. At best, their respective start dates run from the date of their initial appointments, i.e. November 2, 2009 in the case of Mr. Santos and December 1, 2009 in the case of Ms. Edwards.

Plaintiffs hold no legitimate claim of entitlement to continued employment at the CDA on the basis of either their

employment agreements or the Affirmative Action Plan.

Accordingly, defendant's motion for summary judgment on Count II
will be allowed and plaintiff's corresponding motion for summary
judgment will be denied.

                              **ORDER**

    In accordance with the foregoing,

    1)    plaintiffs' motion for summary judgment (Docket No. 24)
          is **DENIED**, and

    2)    defendant's motion for summary judgment (Docket No. 21)
          is, with respect to plaintiff Edwards, **DENIED** as to
          Count I, but is, with respect to all other counts,
          **ALLOWED**.


**So ordered.**

                              /s/ Nathaniel M. Gorton
                              Nathaniel M. Gorton
                              United States District Judge
Dated March 19, 2013